*THOMAS E. MOSS, Idaho Bar No. 1058*
*United States Attorney*
*WENDY J. OLSON*
*Assistant United States Attorney*
*District of Idaho*
*Washington Group Plaza IV, Suite 600*
*800 East Park Boulevard*
*Boise, Idaho  83712*
*Telephone:  (208) 334-1211*
*Facsimile:  (208) 334-1413*

*LORETTA KING*
*Acting Assistant Attorney General*
*United States Department of Justice*
*Civil Rights Division*
*ERIN ASLAN*
*Trial Attorney*
*Criminal Section - PHB 5810*
*950 Pennsylvania Avenue, NW*
*Washington, District of Columbia  20530*
*Telephone:  (202) 514-3204*
*Facsimile:  (202) 514-8336*

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CR No. 09-033-S-EJL |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MICHAEL J. BULLARD, | ) | |
| JENNIFER J. HARTPENCE, | ) | |
| a/k/a JENNIFER ERICKSON, and | ) | |
| RICHARD C. ARMSTRONG, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## TRIAL BRIEF OF THE UNITED STATES

The United States of America, through the undersigned attorneys, submits this trial brief to inform the Court of the general nature of this case and to assist the Court with various legal and evidentiary matters at trial in the above-captioned case.  Trial is set for July 16, 2009.

## I.      INTRODUCTION

On February 11, 2009, a federal grand jury sitting in Boise, Idaho, returned a two-count indictment against defendants Michael J. Bullard, Richard C. Armstrong, Jennifer J. Hartpence, a/k/a Jennifer Erickson, and James D. Whitewater charging each defendant with one count of conspiring to deprive the victim, R.S., of his federally-protected rights, in violation of 18 U.S.C. § 241, and one count of willfully intimidating and interfering with R.S.'s right to enjoy a place of public accommodation through force or threat of force because of R.S.'s race, color, or national origin, while aiding and abetting one another, in violation of 18 U.S.C. §§ 245(b)(2)(F) and 2.

These charges arise out of the defendants' racially motivated beating of R.S., a young African American man, in the parking lot of a Wal-Mart Supercenter store in Nampa, Idaho, on July 4, 2008.  R.S. suffered bodily injury as a result of the defendants' actions.  At the time of this beating, the Wal-Mart store housed both a McDonald's restaurant and a video game arcade.

On July 2, 2009, defendant Whitewater entered into a Plea Agreement with the United States in which he has agreed to plead guilty to Count One of the indictment.  The three remaining defendants have elected to take this case to trial.  Trial is set for July 16, 2009.

In addition to this trial brief, the United States will separately file proposed jury instructions, proposed voir dire, an exhibit list, and a witness list.

## II.     OVERVIEW OF THE EVIDENCE

### A.      Events of July 4, 2008

At trial, the United States will introduce evidence to establish the following facts with respect to the defendants' beating of R.S. on July 4, 2008:

On the evening of July 3, 2008, the three male defendants, Bullard, Armstrong, and Whitewater, and their three girlfriends (one of whom is Hartpence, the female defendant) were hanging out and drinking alcoholic beverages at the apartment shared by defendant Armstrong

and his girlfriend.  This apartment was located next to the Wal-Mart Supercenter store ("Wal-Mart") on 12th Avenue Road in Nampa, Idaho, where the beating of R.S. occurred. While the group was socializing, defendant Armstrong's girlfriend asked him to go to the store and purchase orange juice to mix with the alcohol.  Just past midnight, on July 4, 2008, the four defendants walked to Wal-Mart to buy orange juice, while defendants Armstrong's and Whitewater's girlfriends stayed behind at the apartment.[1]

On this same evening, R.S. went to Wal-Mart after work to purchase milk.  When the defendants arrived in the juice aisle, they saw R.S. standing a few feet away.  The defendants then proceeded to the check-out line and walked towards the Wal-Mart exit.  While inside Wal-Mart, defendants Bullard, Hartpence, and Armstrong talked about R.S. in racially derogatory terms and defendant Bullard began to discuss physically attacking R.S.  Just before the defendants left Wal-Mart, they walked past the McDonald's restaurant inside the store, and stopped by the Wal-Mart exit to prepare for the assault.  Defendant Bullard gave some of his belongings to Hartpence to safeguard in her purse.  Meanwhile, the defendants continued to refer to R.S. in racially derogatory terms and defendant Bullard continued to discuss physically attacking R.S.  During these conversations, the defendants encouraged Bullard to attack R.S.

The defendants then exited to the Wal-Mart parking lot, where Bullard paced back and forth as he smoked a cigarette.  Defendants Hartpence, Armstrong, and Whitewater waited next to the Wal-Mart door for R.S. to leave the store.  When defendants Hartpence, Armstrong, and Whitewater saw R.S. leaving the store, they alerted Bullard.  Defendant Bullard then approached

---

[1]      Defendant Whitewater and his girlfriend were married in January, 2009.  For the sake of convenience and to clearly represent the facts as they existed at the time of the incident, defendant Whitewater's wife is referred to in this memorandum as his girlfriend.  The United States anticipates that both defendant Whitewater and his wife will testify at trial as prosecution witnesses.  This, together with the fact that all of the events at issue occurred prior to the marriage, will obviate any spousal privilege issue at trial.

R.S. as he walked out of Wal-Mart, asked R.S., "What country do you think you're in?" and flicked his cigarette towards R.S.  The defendants yelled for Bullard to "get" the "nigger," referring to R.S.  Defendant Bullard then chased R.S. approximately 350 to 400 feet across the Wal-Mart parking lot, followed by defendants Armstrong and Whitewater.  Meanwhile, defendant Hartpence walked back to defendant Armstrong's apartment with the orange juice.  At the edge of the parking lot, near 12th Avenue Road, defendant Bullard tackled R.S. and brought him to the ground, where Bullard straddled R.S. and punched him repeatedly.  Defendant Armstrong also punched R.S. and defendant Whitewater kicked him.

Eventually, defendants Bullard, Armstrong, and Whitewater stopped beating R.S. and returned to defendant Armstrong's apartment.  At the apartment, defendants Bullard, Armstrong, and Whitewater agreed that if they were questioned about the assault, Bullard would admit that he was the sole perpetrator and everyone would deny the racial motivation for the beating.  Inside the apartment, the defendants bragged and joked about the "fight" they had just had with a "nigger" at Wal-Mart.  Defendant Bullard exclaimed that he had beaten up a "nigger" who was following the defendants around Wal-Mart.

Defendants Armstrong's and Whitewater's girlfriends then drove to the Wal-Mart parking lot, where they encountered R.S.  After helping R.S. look for his car keys, which were lost during the attack, the two women drove R.S. home.  Later that day, R.S. went to his parents' house and told them what had occurred.  While at his parents' house, R.S. called the Nampa Police Department to report the incident.

The defendants and R.S. had never met before this beating; the defendants selected R.S. as the victim of their assault because of his race and his use of the Wal-Mart Supercenter store, which included a McDonald's restaurant and a video game arcade.

Wal-Mart security cameras recorded a portion of the events leading up to the defendants'
assault of R.S.  Specifically, the video footage shows the defendants and R.S. inside the store, as
well as the confrontation in the parking lot.  At trial, the United States intends to introduce
portions of this video footage, as well as still photographic images derived from the video.

### B.    Additional Evidence of Racial Animus

At trial, consistent with this Court's July 2, 2009, Order, the United States also intends to
introduce additional evidence of defendants Bullard's and Armstrong's racial animus, including
evidence of:

(1)    Defendants Bullard's and Armstrong's use and display of racist symbols and
words, such as swastikas, Nazi "SS" lightening bolts, confederate flags, the words "white
power," and racial slurs;

(2)    Defendant Armstrong's dissemination of racist jokes; and

(3)    Prior instances of defendant Armstrong's intimidation of people of color by
displaying the large swastika tattoo on defendant Armstrong's chest.

The United States may also ask the Court to reconsider its preliminary ruling regarding
the admissibility of defendant Bullard's juvenile convictions for spray-painting racially-
motivated graffiti and the words "white power."

### III.    OVERVIEW OF THE APPLICABLE LAW

Each of the four defendants in this case is charged in Count One with conspiring to
deprive the victim, R.S., of his federally protected rights, in violation of 18 U.S.C. § 241, and in
Count Two with willfully interfering with R.S.'s right to enjoy a place of public accommodation
through force or threat of force because of R.S.'s race, color, or national origin, while aiding and
abetting one another, in violation of 18 U.S.C. §§ 245(b)(2)(F) and 2.

### A.   Count One: Conspiracy to Deprive Rights (18 U.S.C. § 241)

Count One of the indictment charges the four defendants with conspiring to deprive R.S.

of his federally protected rights, in violation of 18 U.S.C. § 241.

### 1.   Text of the Statute

Section 241 provides, in pertinent part:

> If two or more persons conspire to injure, oppress, threaten, or intimidate any person
> in any State . . . in the free exercise or enjoyment of any right or privilege secured
> to him by the Constitution or laws of the United States . . . [t]hey shall be [guilty of
> a federal crime].

### 2.   Elements of the Offense

For a defendant to be convicted of a violation of Section 241, the United States must

prove the following elements beyond a reasonable doubt:

(1)   That a conspiracy involving two or more people existed;

(2)   That the object of the conspiracy was to injure, oppress, threaten, or intimidate a

person in the free exercise or enjoyment of a right protected by the Constitution or laws of the

United States; in this case, the right of the victim, R.S., to full and equal enjoyment of a place of

public accommodation without discrimination on the grounds of race, color, or national origin;

and

(3)   That the defendant knowingly and voluntarily joined the conspiracy with an

understanding of its purpose and unlawful nature.  See 18 U.S.C. § 241.

### 3.   No Overt Act Required

Section 241, unlike the general federal conspiracy statute, 18 U.S.C. § 371, requires no

proof of an overt act in furtherance of the conspiracy.  United States v. Skillman, 922 F.2d 1370,

1375-76 (9th Cir. 1990) (holding that no overt act is required for a § 241 conspiracy).  Although

Section 241 does not require proof of an overt act, the indictment in this case sets forth a series

of acts committed by the defendants during and in furtherance of the alleged conspiracy.  The

jury may rely upon these acts in determining whether a conspiracy existed, the purpose of the

conspiracy, and whether the defendants knowingly joined the conspiracy.

4.       Element One: The Existence of a Conspiracy

A conspiracy is an agreement involving two or more people who join together either to

attempt to accomplish an unlawful purpose or to attempt to accomplish a lawful purpose by

unlawful means.  United States v. Feola, 420 U.S. 671, 695-96 (1975).  The crux of the offense is

an agreement to violate or disregard the law.  United States v. General Motors, 384 U.S. 127

(1966).  The United States does not need to prove that the agreement between the coconspirators

was express or formal.  Instead, the evidence must show only that the defendants came to a

mutual understanding -- either explicitly or tacitly -- to try to accomplish an unlawful plan.  See

Pereira v. United States, 347 U.S. 1, 12 (1954); Iannelli v. United States, 420 U.S. 770, 777 n.10

(1975) (noting that the conspiratorial agreement "need not be shown to have been explicit").

Similarly, the United States does not have to prove that each conspirator joined in the

conspiracy at the time of its formation, or that each conspirator played an equal role in the

conspiracy.  See United States v. Saavedra, 684 F.2d 1293, 1301 (9th Cir. 1982) (holding that a

conspiracy defendant is vicariously liable for all acts taken by her coconspirators, regardless of

her role in those offenses); Skillman, 922 F.2d at 1373 (noting that once a conspiracy has been

established, the government need only show a "slight connection" between a defendant and that

conspiracy).

Ordinarily, only the results of a conspiracy, rather than the agreement itself, are visible.

For that reason, a conspiracy may be proven through circumstantial evidence.  United States v.

Garcia, 151 F.3d 1243, 1245 (9th Cir. 1998) ("[A]n implicit agreement may be inferred from

circumstantial evidence."); United States v. Penagos, 823 F.2d 346, 348 (9th Cir. 1987) ("The

existence of a conspiracy may be proved by circumstantial evidence that defendants acted

together for a common illegal goal.").

At trial, the United States will introduce physical and testimonial evidence to establish

the existence of the charged conspiracy.  As noted, a portion of the events leading up to the

defendants' beating of R.S. was captured on Wal-Mart security cameras.  The video footage

from these cameras will show the defendants preparing for their attack upon R.S. just prior to

leaving the Wal-Mart store, as well the defendants' concert of action in exiting Wal-Mart, laying

in wait for R.S. outside the store, and confronting R.S.  The events depicted in this video footage

will be explained by witnesses at trial, including R.S. and defendant Whitewater.  Defendant

Whitewater also will testify about the defendants' statements inside Wal-Mart leading up to their

assault on R.S., their concert of action in preparing for the attack, Bullard confronting R.S., the

defendants chasing R.S. across the Wal-Mart parking lot, and the defendants beating R.S. at the

end of the parking lot.  Finally, the United States anticipates that defendants Armstrong's and

Whitewater's girlfriends will testify about the defendants' statements upon their return to the

apartment.  These statements further establish the defendants' agreement and concert of action in

beating R.S.

5.      Element Two: The Purpose of the Conspiracy

The United States must also prove that the purpose of the conspiracy was to injure,

oppress, threaten, or intimidate the victim, R.S., in the free exercise of a federally protected right.

18 U.S.C. § 241; United States v. Price, 383 U.S. 787, 800 (1966); United States v. Guest, 383

U.S. 745, 760 (1966); United States v. Reese, 2 F.3d 870, 881, 881 n.17 (9th Cir. 1993).

In this case, the purpose of the conspiracy was to threaten and assault R.S. as he left the

Wal-Mart store, thereby interfering with his federally protected rights.  The underlying right in

this case is R.S.'s right to the free and equal enjoyment of a place of public accommodation

without discrimination on the grounds of race, color, or national origin, which is secured by 42

U.S.C. § 2000a.  See United States v. Johnson, 390 U.S. 563, 565-66 (1968) (holding that by

virtue of the Civil Rights Act of 1964, 42 U.S.C. § 2000a, the right to service in a public

restaurant is a right protected by the laws of the United States, within the meaning of § 241).

Section 2000a provides that "[a]ll persons shall be entitled to the full and equal

enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any

place of public accommodation ... without discrimination ... on the grounds of race, color, ... or

national origin."  Section 2000a defines a "place of public accommodation" as both a "facility

principally engaged in selling food for consumption on the premises, including ... any such

facility located on the premises of any retail establishment," 42 U.S.C. § 2000a(b)(2), and a

"place of ... entertainment," 42 U.S.C. § 2000a(b)(3).  Section 2000a(b)(4)(A)(ii) also defines a

"place of public accommodation" as "any establishment ... within the premises of which is

physically located any such covered establishment."  That is to say, the statute includes

businesses, such as the Wal-Mart store, which house establishments engaged in the sale of

food (the McDonald's restaurant) and places of entertainment (the video game arcade).  E.g.,

United States v. Baird, 85 F.3d 450, 453-54 (9th Cir. 1996) (deciding that the presence of two

video games within a 7-11 convenience store made the store a "place of entertainment" within

the meaning of 42 U.S.C. § 2000a(b)(3)).

The words "injure, oppress, threaten, or intimidate" are not used in any technical sense.

Here, the defendants' actions and remarks when confronting R.S. as he exited the store, chasing

him 350 to 400 feet across the parking lot, and beating him show that the purpose of the

conspiracy was to injure, oppress, threaten, and intimidate R.S.  Formation of the agreement as

the defendants departed Wal-Mart and the confrontation's proximity to R.S.'s use of the Wal-

Mart store further establish that the conspiracy was aimed at interfering with R.S.'s exercise of his right to use a place of public accommodation free from racial violence and discrimination.

In satisfying this second element, the United States is not required to prove that the defendants were thinking in constitutional or legal terms, or that they knew that a federal law protected the right with which they intended to interfere.  See, e.g., Reese, 2 F.3d at 881.  In fact, the defendants need not even have known that their actions would violate anyone's protected rights.  O'Malley, Grenig, and Lee, Federal Jury Practice & Instructions, § 29.05 (5th Ed. 2000).  This element can be established by proof that the defendants intended to do an act that necessarily had the effect of depriving R.S. of a federally protected right -- here the right to use a place of public accommodation.  See Screws v. United States, 325 U.S. 91, 106-07 (1945); see also United States v. Nelson, 277 F.3d 164, 193 (2d Cir. 2002); United States v. Wood, 780 F.2d 955, 961 (11th Cir. 1986).  Indeed, a reckless disregard for a person's rights is evidence of specific intent to deprive that person of those rights.  Guest, 383 U.S. at 760; see also United States v. Gwaltney, 790 F.2d 1378, 1386 (9th Cir. 1986) (approving instruction, in a civil rights case, that it was not necessary for the government to prove that defendant was "thinking in constitutional terms at the time of the incident" and noting that "a reckless disregard for a person's constitutional rights is evidence of specific intent to deprive that person of those rights.").

At trial, the United States will prove, through witness testimony and circumstantial evidence of racial animus, that the purpose of the charged conspiracy was to deprive R.S. of a federally protected right.  For example, the United States anticipates that R.S. will testify that Bullard approached him as soon as he walked out of the Wal-Mart store; asked him, "What country do you think you're in?", and threw something at him.  R.S. then heard the other defendants yell to Bullard to "get" the "nigger," which prompted R.S. to flee.  This testimony,

together with the anticipated testimony of defendants Armstrong's and Whitewater's girlfriends that the defendants laughed and joked about the attack and referred to R.S. in racially derogatory terms, will establish the object of the charged conspiracy.

      6.     <u>Element Three: Willful and Knowing Entry into the Conspiracy</u>

Finally, the United States must prove that the defendants knowingly joined the conspiracy with an understanding of its purpose and unlawful nature.  To participate "knowingly" means to participate voluntarily and intentionally and not by ignorance, accident or mistake.  <u>See</u> <u>United States v. Trevino</u>, 419 F.3d 896, 901 (9th Cir. 2005).  An act is done knowingly and willfully if it is done voluntarily and with the intent to do something that the law forbids -- in this case, with the intent to deprive someone of federally protected right to use a place of public accommodation.  <u>See</u> <u>Screws</u>, 325 U.S. at 106-07.

A defendant's intent to join a conspiracy often cannot be proven directly because there is no way of directly scrutinizing the workings of the human mind.  For that reason, circumstantial evidence is admissible to show a defendant's membership in a conspiracy.  This circumstantial evidence includes evidence of the defendant's relationship with other members of the conspiracy; the length of this association; his attitude and conduct; and the nature of the crime.  <u>E.g.</u>, <u>United States v. Wright</u>, 215 F.3d 1020, 1028 (9th Cir. 2000); <u>United States v. Mares</u>, 940 F.2d 455, 458 (9th Cir. 1991).

In this case, the defendants' membership in the conspiracy will be proven through defendant Whitewater's testimony, additional witness testimony regarding statements made by the defendants after the attack, and circumstantial evidence of acts the defendants took in furtherance of the conspiracy, as depicted in the Wal-Mart security video.

**B.      Count Two: Interference with a Federally-Protected Right through Force or Threat of Force (18 U.S.C. §§ 245, 2)**

Count Two of the indictment charges the four defendants with using force or a threat of force to willfully intimidate and interfere with R.S.'s right to enjoy a place of public accommodation because of his race, color, or national origin, while aiding and abetting one another, in violation of 18 U.S.C. §§ 245(b)(2)(F) and 2.

1.      Text of the Statute

Section 245(b)(2)(F) provides, in pertinent part:

> Whoever . . . by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with . . . any person because of his race, color, [ ] or national origin  . . . and because he is or has been . . . enjoying the goods, services, facilities, privileges, advantages, or accommodations of . . . of any other establishment which serves the public and within the premises of which is physically located [a restaurant or place of entertainment] . . . shall be [guilty of a federal crime].

2.      Elements of the Offense

To convict a defendant of violating § 245(b)(2)(F), the United States must prove the following elements beyond a reasonable doubt:

(1)      That the defendant used force or the threat of force;

(2)      That the defendant willfully injured, intimidated, or interfered with the victim, or attempted to do so;

(3)      That the defendant acted because of the victim's race, color, or national origin;

(4)      That the defendant acted because the victim was enjoying the goods, services, or facilities of a place of public accommodation, that is, an establishment within the premises of which is physically located a restaurant or place of entertainment; and, for a felony violation,

(5)     That bodily injury resulted.  <u>See</u> 18 U.S.C. § 245(b); <u>see also generally</u> <u>United States v. Allen</u>, 341 F.3d 870, 878-79 (9th Cir. 2003).  Each of these elements is addressed in greater detail below.

### 3.     Element One: Use or Threatened Use of Force

The plain language of  § 245 prohibits interference by both the threatened and actual use of force.  The Wal-Mart security video and witness testimony will establish that the defendants both threatened and used force against the victim.

Defendant Bullard threatened R.S. when he waited for R.S. to exit the store, asked R.S. what country he thought he was in, threw his lit cigarette at R.S., and chased R.S. approximately 350 to 400 feet across the Wal-Mart parking lot.  Defendants Armstrong and Hartpence threatened Smith by yelling at defendant Bullard to "get" the "nigger."

The defendants also used force against R.S., which includes power, violence, compulsion, or restraint exerted upon or against a person or thing.  <u>Webster's Third New International Dictionary</u> (defining force, inter alia, as "power, violence, compulsion or constraint exerted against a person or thing"); <u>United States v. McDermott</u>, 29 F.3d 404, 409 (8th Cir. 1994) (similar definition of force used); <u>United States v. Bamberger</u>, 452 F.2d 696, 699 (2d Cir. 1971) (discussing and relying on Webster's definition of force).  Defendants Bullard's and Armstrong's repeated hitting and kicking of R.S. constitute a use of force under § 245.

### 4.     Element Two: Willful Injury, Intimidation, or Interference with the Victim

The United States must also prove that the defendants willfully injured, intimidated, or interfered with R.S., or attempted to do so.  The words "injures," "intimidates," and "interferes," as used in Section 245, are not used in any technical sense.  They cover a variety of conduct intended to harm, frighten or prevent the free action of others.  <u>McDermott</u>, 29 F.3d at 410.

"Willfully" requires the United States to establish that the defendants committed the acts voluntarily and purposefully, rather than by inadvertence or mistake, and that the defendants acted with the specific intent to do something that the law forbids.  Screws v. United States, 325 U.S. 91, 101 (1947); Devitt & Blackmar, Federal Jury Practice and Instructions §§ 17.03 .05 (4th ed. 1990).  The issue is whether the defendants intended to intimidate the victim, not whether the victim was actually intimidated.  United States v. Redwine, 715 F.2d 315, 322 (7th Cir. 1984) ("interference or intimidation is to be inferred from violent acts or threats, and there is no need to show the subjective state of mind of the intended victim").

Much of the same evidence discussed in the previous section regarding the § 241 violation charged in Count One also establishes the defendants' state of mind in beating R.S. The defendants' actions of preparing for the attack by the Wal-Mart entrance, lying in wait for R.S. outside the store, confronting R.S. outside the store entrance, chasing R.S. approximately 350 to 400 feet across the Wal-Mart parking lot, tackling R.S., and repeatedly kicking and punching R.S. demonstrate that the defendants intended to injure, intimidate, and interfere with R.S.

### 5. Element Three: Because of Race, Color, or National Origin

The United States must also establish that the defendants' actions were motivated by the victim's race, color, or national origin.  So long as the United States proves that the defendants were motivated in part by discriminatory animus, the presence of other motives, such as personal dislike, anger, or revenge, will not make the conduct any less a violation of Section 245.  See, e.g., United States v. Johns, 615 F.2d 672, 675 (5th Cir. 1980) (rejecting a sufficiency of the evidence challenge to 42 U.S.C. § 3631 and 18 U.S.C. § 245 convictions) ("The presence of other motives, given the existence of the defendants' motive to end interracial cohabitation, does not make their conduct any less a violation of 42 U.S.C. § 3631."); accord United States v.

Magleby, 241 F.3d 1306, 1310 (10th Cir. 2001); United States v. McGee, 173 F.3d 952, 957 (6th

Cir. 1999); United States v. Hartbarger, 148 F.3d 777, 784 n.6 (7th Cir. 1998), overruled on

other grounds by, United States v. Colvin, 353 F.3d 569 (7th Cir. 2003); United States v.

Gresser, 935 F.2d 96, 101 (6th Cir. 1991); United States v. Bledsoe, 728 F.2d 1094, 1097-98 (8th

Cir. 1984).

The United States will establish the defendants' racial motivation through the testimony

of R.S., defendant Whitewater, and defendants Armstrong's and Whitewater's girlfriends.  These

witnesses will establish that the defendants repeatedly used racial slurs in reference to R.S.

before, during, and after the attack, and that the defendants all laughed and joked about the

beating at the apartment.

The United States will further establish defendant Bullard's and Armstrong's racial

motives in the charged offense through significant evidence of their racial animus in other acts

admissible under Federal Rule of Evidence 404(b), as well as their use of racist symbols,

language, and jokes.

6.      Element Four: Because of the Victim's Use of a Place of Public
        Accommodation

The United States also will have to establish that the defendants acted because the victim,

R.S., was enjoying the goods, services, or facilities of a place of accommodation, that is, an

establishment within the premises of which is physically located a restaurant or place of

entertainment.  The Wal-Mart store at which the defendants assaulted R.S. is an entity covered

by  § 245's definition of a place of public accommodation because, at the time of the incident,

the store housed both a McDonald's restaurant and video game arcade.  See 18 U.S.C. §

245(b)(2)(F) (defining a statutorily protected activity as, among other things, "enjoying the

goods, services, facilities, privileges, advantages, or accommodations of ... any other

establishment which serves the public and ... within the premises of which is physically located [a restaurant]" or "any other place of ... entertainment"); see also Baird, 85 F.3d at 453-54 (deciding that the presence of two video games within a 7-11 convenience store made the store a "place of entertainment" within the meaning of 42 U.S.C. § 2000a(b)(3)).  It does not matter that the McDonald's restaurant inside the Wal-Mart store was closed at the time of the beating.  See United States v. Allen, 341 F.3d 870, 885 (9th Cir. 2003) (holding that the defendants' actions constituted "a violation of the victims' federal civil rights, regardless of whether Pioneer Park was open or closed at the time of the crimes").

As with the § 241 violation charged in Count One, the United States is not required to establish that the defendants were thinking in legal terms to prove the defendants' intent to interfere with R.S.'s rights.  Instead, the United States must simply show that the defendants intended to do something that would have the effect of interfering with the victim's federally protected right.  Screws, 325 U.S. at 106-07; see also Gwaltney, 790 F.2d at 1386 (approving instruction, in a civil rights case, that it was not necessary for the government to prove that defendant was "thinking in constitutional terms at the time of the incident" and noting that "a reckless disregard for a person's constitutional rights is evidence of specific intent to deprive that person of those rights.").

Moreover, the United States may establish the defendants' intent to interfere with R.S.'s use of a place of public accommodation by circumstantial evidence.  See United States v. Black, 995 F.2d 233 (Table), No. 92-10419, 1993 WL 181388, at * 2 (9th Cir. May 27, 1993) (unpublished) (holding that the defendant's intent to interfere with the victim's use of a gas station/convenience store was established circumstantially with evidence of the defendant's hatred of African-Americans; indiscriminate attack on the victim; and of their statements that the victim should get out of the town and the defendant's "'hood"); United States v. Ebens, 800 F.2d

1422, 1429 (6th Cir. 1986), abrogated on other grounds by, Huddleston v. United States, 485 U.S. 681 (1988) (ruling that the defendant's intent to interfere with the victim's use of a nude dancing lounge could be established by circumstantial evidence, which included the defendant's use of racial slurs and other remarks to the victim that the jury could infer "were intended to make [the victim's] remaining on the premises uncomfortable and embarrassing and to intimidate and dissuade him from remaining on the premises because of that bias").

At trial, the United States will establish this element with strong circumstantial evidence. The evidence will show that the defendants selected their victim, whom they did not know, while the victim was inside Wal-Mart; that they repeatedly referred to the victim in racially derogatory terms and discussed beating him while inside Wal-Mart; that the subjects confronted the victim as he left Wal-Mart, threatening him, using racial slurs, chasing him, and ultimately physically attacking him in the parking lot of the Wal-Mart store.  As in the cases cited above, the defendants' actions in this matter circumstantially establish their intent.

The defendants' actions give rise to the permissible inference that they intended the natural consequence of their harassment, which was to interfere with the victim's use of the store.  United States v. Nelson, 277 F.3d 164, 198 (2d Cir. 2000) (deciding that proof of the defendant's intent to assault victim while using public facility sufficient and the United States did not have to prove specific motive on part of defendant to deny the victim's use of the public facility); cf. United States v. Price, 464 F.2d 1217, 1218 (8th Cir. 1972) (rejecting defendant's contention that his racially-motivated assault of the victim only incidentally occurred on federal property because the defendant knew all of the circumstances surrounding his assault and the natural and probable consequences of his acts were to prevent the victim from enjoying the federal recreational facilities) (discussing § 245(b)(1)(B)).

7.      Element Five: Bodily Injury Resulted

The last element required for a felony conviction is proof that the offense resulted in bodily injury to the victim.  "Bodily injury means any injury to the body, no matter how minor or temporary, including pure physical pain."  See Hudson v. McMillian, 503 U.S. 1, 5 (1992); see also United States v. Perkins, 132 F.3d 1324, 1326 (10th Cir. 1997) (holding that an injury that is painful or obvious, or is of a type for which medical attention ordinarily would be sought, is "significant" bodily injury); United States v. Myers, 972 F.2d 1566, 1572 (11th Cir. 1992) (approving instruction defining bodily injury as "any injury to the body, no matter how temporary" including "physical pain as well as any burn or abrasion").  The United States does not have to prove that the defendant intended to cause injury; the United States need prove only that bodily injury resulted from the defendant's conduct.  United States v. Marler, 756 F.2d 206, 216 (1st Cir. 1985); United States v. Hayes, 589 F.2d 811, 820-22 (5th Cir. 1979).  Evidence that R.S. was in pain and sore following the beating will satisfy this element.

8.      Aiding and Abetting Liability

Count Two of the indictment charges the defendants with committing a violation of Section 245 while aiding and abetting one another.  The aiding and abetting statute provides: "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."  18 U.S.C. § 2(a).  For a defendant to be convicted of aiding and abetting a § 245(b)(2)(F) violation, the United States will have to prove the following elements beyond a reasonable doubt:

(1)      That a violation of § 245 was committed by someone;

(2)      That the defendant knowingly and intentionally aided, counseled, commanded, induced or procured that person to commit a violation of § 245; and

-18-

(3)      That the defendant acted before the crime was completed.  <u>See</u> 18 U.S.C. § 2; 9th

Cir. Manual of Model Crim. Jury Instr., 5.1 - Aiding and Abetting (approved March, 2005).

       To be convicted as an aider and abettor, "it [i]s not enough that the defendant associated

with another or was present at the scene of the crime, or even did things that were helpful to

another."  <u>United States v. Burgess</u>, 791 F.2d 676, 679 (9th Cir. 1986); <u>see also</u> <u>Altamirano v.</u>

<u>Gonzales</u>, 427 F.3d 586, 595 (9th Cir. 2005); 9th Cir. Manual of Model Crim. Jury Instr., 5.1 -

Aiding and Abetting (approved March, 2005).  Instead, "[t]he prosecution must prove that the

defendant was a participant" in the offense.  <u>Id.</u> (internal quotation marks and citation omitted);

<u>see also</u> 9th Cir. Manual of Model Crim. Jury Instr., 5.1 - Aiding and Abetting (approved March,

2005) ("The evidence must show beyond a reasonable doubt that the defendant acted with the

knowledge and intention of helping that person commit [*crime charged*].").  Finally, the United

State "is not required to prove precisely which defendant actually committed the crime and

which defendant aided and abetted."  <u>United States v. Vaanderling</u>, 50 F.3d 696, 702 (9th Cir.

1995) (quoting 9th Cir. Manual of Model Crim. Jury Instr., 5.1 - Aiding and Abetting (approved

March, 2005)) (internal quotation marks omitted).

       At trial, the evidence will show that each defendant aided and abetted one another in

committing the violation of Section 245(b)(2)(F) charged in Count Two.  Defendant Bullard was

involved in every aspect of the substantive offense charged in Count Two; indeed, he was the

instigator of the attack and principal assailant.  Defendant Hartpence aided and abetted the

beating by offering verbal encouragement (discussing R.S. in racially derogatory terms;

encouraging Bullard to attack R.S.; and yelling at Bullard to "get" the "nigger") and acts of

assistance (safeguarding Bullard's belongings so Bullard could assault R.S. unencumbered;

alerting Bullard to R.S.'s imminent arrival).  Defendant Armstrong likewise discussed R.S. in

racially derogatory terms and encouraged Bullard to beat R.S.  Defendant Armstrong then joined

into the chase and physical attack, running after Bullard and R.S. across the parking lot and physically assaulting R.S.  The evidence will show that the defendants' words and actions rise far above "mere presence" or "unknowing assistance" in the attack upon R.S.  Based on the defendants' conversation, they knew what defendant Bullard planned, they encouraged him to carry out the plan, and they each lent assistance to ensure that the planned attack was successful.

## IV.   EVIDENTIARY ISSUES

### A.   Overview

The United States anticipates that the following evidentiary issues may arise at trial, including the admissibility of:  (1) other acts evidence with respect to defendants Bullard and Armstrong;  (2) improper character evidence;  (3) the defendants' statements, as either admissions of a party opponent or coconspirator statements;  (4) prior criminal convictions of government witnesses;  (5) cross-examination of government witnesses regarding the witnesses' drug use or a plea agreement;  (6) the victim's statements following the attack to other individuals as "excited utterances";  (7) the victim's prior consistent statements to rebut a charge of recent fabrication;  (8) defendant Armstrong's statements after the incident, which reflect his consciousness of guilt;  (9) the possible presence of an adverse witness in the United States' case-in-chief; and  (10) other issues as they arise.

The United States has separately filed notices of intent to admit other acts evidence and motions in limine to address items (1) through (5) in the above list of anticipated evidentiary issues, and the Court has made preliminary rulings.  Items (6) through (9) from the above list of anticipated evidentiary issues are addressed in greater detail below.

### B.   Excited Utterances

At trial, the United States intends to introduce the victim's statements to the girlfriends of defendants Armstrong and Whitewater shortly after the July 4, 2008, beating as "excited

utterances" pursuant to Federal Rule of Evidence 803(2).  The United States anticipates that the proffered statements will consist of the victim's description of events immediately prior to the attack, the attack itself, and the physical appearance of the victim's assailants.

Rule 803(2) provides for the admission of statements that "relat[e] to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  Rule 803(2) is a broad rule, and is not limited to statements describing the startling event; rather, the Rule permits admission of any statement that "relates to" the event.  People of Territory of Guam v. Cepeda, 69 F.3d 369, 372-73 (9th Cir. 1995) (approving the admission of statements describing both the robbery and the physical appearance of the robber under Rule 803(2)) (citing Bemis v. Edwards, 45 F.3d 1369, 1372 n.1 (9th Cir. 1995) ("the statement need only 'relat[e] to' the startling event") (alteration in original); United States v. Moore, 791 F.2d 566, 572 (7th Cir. 1986) ("The excited utterance exception allows a broader scope of subject matter coverage than does the present sense impression exception, which limits the subject matter of the statement to a description or explanation of the event.")).

For a statement to be admissible under Rule 803(2), there must be some startling event, and the statement must be a spontaneous reaction to that event.  See United States v. Alarcon-Simi, 300 F.3d 1172, 1175 (9th Cir. 2002); Cepeda, 69 F.3d at 372-73.  Factors to be considered in determining the admissibility of a statement made in response to a startling event include "the time a statement was made,  . . .  the age of the declarant, the characteristics of the event and the subject matter of the statements."  United States v. Rivera, 43 F.3d 1291, 1296 (9th Cir. 1995).  The court may also consider whether the statements were made at the first real opportunity to report the incident after the startling event occurred.  Id.

Here, the proffered statements meet all of the criteria for admissibility under Rule 803(2). The victim, R.S., described his attack and assailants to two of the defendants' girlfriends after

R.S. had been called racial slurs, chased, tackled, and physically assaulted by defendants Bullard, Armstrong, and Whitewater.  The racial insults, chase, and beating certainly constitute a "startling event" under Rule 803(2).  Indeed, the nature of this attack -- including the fact that it was racially-motivated and involved multiple perpetrators yelling racial slurs, chasing the victim approximately 350 to 400 feet, and repeatedly hitting and kicking him -- was particularly startling to the victim, a young African American man.  The characteristics of this incident, as well as the subject matter of the statements, support the admissibility of R.S.'s description of the incident, the immediately preceding events, and the physical description of his assailants.

As for the timing of the statements, the proffered statements and the startling event were contemporaneous.  R.S. described what had happened to him shortly after the attack when the girlfriends of defendants Armstrong and Whitewater drove to the Wal-Mart parking lot to check on R.S. after learning of the beating.  Moreover, this was the first real opportunity R.S. had to report the incident.  The United States anticipates that R.S. will testify that he did not have a cellular telephone with him when the incident occurred.  The girlfriends of defendants Armstrong and Whitewater were the first people R.S. encountered after the incident and, therefore, R.S.'s conversation with these two women was the first real opportunity he had to report the beating.

It does not matter that R.S. may have made these statements to the two girlfriends in response to their inquiry.  The Ninth Circuit had expressly ruled that "[d]eclarations relating to the circumstances of a violent crime, made by the victim shortly after its occurrence . . . may be admissible although made in response to an inquiry."  Cepeda, 69 F.3d at 372 (internal quotation marks and citation omitted) (alteration in original) (approving the admission of statements made in response to police questioning after the robbery).  The victim's statements following the attack should, therefore, be admitted as "excited utterances" under Rule 803(2).

C.      **Prior Consistent Statements**

The United States anticipates that it may become necessary to introduce the prior

consistent statements of a government witness to rebut a charge of recent fabrication.  Such

evidence should be admitted pursuant to Federal Rule of Evidence 801(d)(1)(B) to rehabilitate

the witness' credibility.

Rule 801(d)(1)(B) provides that a witness' prior consistent statement is admissible as

non-hearsay where it is "consistent with the declarant's testimony and is offered to rebut an

express or implied charge against the declarant of recent fabrication or improper influence or

motive."  To be admissible, the party offering the prior consistent statement must satisfy the

following four elements: "(1) the declarant must testify at trial and be subject to

cross-examination;  (2) there must be an express or implied charge of recent fabrication or

improper influence or motive of the declarant's testimony;  (3) the proponent must offer a prior

consistent statement that is consistent with the declarant's challenged in-court testimony; and,

(4) the prior consistent statement must be made prior to the time that the supposed motive to

falsify arose."  United States v. Chang Da Liu, 538 F.3d 1078, 1086 (9th Cir. 2008) (quoting

United States v. Collicott, 92 F.3d 973, 979 (9th Cir.1996)).

Prior consistent statements are properly admitted to rebut allegations of, among other

things, the witness' alleged financial motive, the cooperating defendants' alleged desire to avoid

criminal responsibility, and the witness' alleged desire to remain in the United States during the

investigation and prosecution of the case.  Chang Da Liu, 538 F.3d at 1086 (financial assistance

from the FBI); United States v. Gonzalez, 533 F.3d 1057, 1062-63 (9th Cir. 2008) (money

damages from a pending civil lawsuit); United States v. Washington, 462 F.3d 1124, 1135 (9th

Cir. 2006) (alleged desire to avoid criminal responsibility); Arizona v. Johnson, 351 F.3d 988,

999 (9th Cir. 2003) (witness' alleged desire to remain in the United States).  Thus, should any of

the defendants suggest during cross-examination that a prosecution witness has an improper

motive or has fabricated his or her testimony, the United States should be permitted to introduce

prior consistent statements of that witness, which were made before the alleged motive arose.

On the other hand, the United States' cross-examination of a defendant or presentation of

testimony contrary to that of a defendant does not permit that defendant to introduce his or her

prior consistent statements.  As the Ninth Circuit has observed, "[m]ere contradictory testimony

cannot give rise to an implied charge of fabrication."  Breneman v. Kennecott Corp., 799 F.2d

470, 473 (9th Cir.1986).  Moreover, the United States may properly admit a defendant's

statements in its case-in-chief to establish the defendant's guilt without triggering the provisions

of Rule 801(d)(1)(B).  See United States v. Bao, 189 F.3d 860, 864-65 (9th Cir. 1999).  Thus, a

defendant's prior consistent statements should not be admitted unless or until his or her

testimony has been expressly attacked as fabricated or improperly motivated.  Id. (ruling that the

defendant's statement was not admissible under Rule 801(d)(1)(B) because the government had

not attacked his testimony as fabricated); see also United States v. Navarro-Varelas, 541 F.2d

1331, 1334 (9th Cir.1976) (same).

### D.    Consciousness of Guilt

The United States intends to call a witness to testify regarding, among other things,

defendant Armstrong's statements to the witness, which reflect defendant Armstrong's

consciousness of guilt.  Specifically, the United States expects that this witness will testify that

he and defendant Armstrong were housed in the same section of Canyon County Jail for

approximately one month in early 2009.  The United States anticipates that the witness will

testify that on the day he was transferred to another section of Canyon County Jail, on or about

February 18, 2009, defendant Armstrong told the witness, "If you see Mike, tell him he's done."

The witness is expected to testify that he interpreted Armstrong's statement as a threat to the

physical well-being of "Mike," who the witness knew to be Armstrong's co-defendant in a case involving an alleged racially-motivated beating at a Wal-Mart store, and that defendant Armstrong made this statement because he suspected that "Mike," identified as defendant Bullard, was cooperating with law enforcement.

The witness' testimony concerning defendant Armstrong's statement is properly admitted to prove defendant Armstrong's consciousness of guilt.  "Federal caselaw . . . is uniform in holding that threats are relevant to consciousness of guilt." Ortiz-Sandoval v. Gomez, 81 F.3d 891, 897 (9th Cir. 1996); see also United States v. Begay, 567 F.3d 540, 552 (9th Cir. 2009); Phillips v. United States, 334 F.2d 589, 592 (9th Cir.1964).

### E.    Possible Adverse Witness

The United States intends to call defendant Armstrong's girlfriend as a prosecution witness in its case-in-chief.  However, the United States anticipates that defendant Armstrong's girlfriend may be an adverse witness.  Defendant Armstrong's girlfriend has testified on his behalf at his detention hearing in this case, as well as at trial in a domestic violence case in Nampa, Idaho, in which defendant Armstrong was charged with misdemeanor assault for allegedly having punched his girlfriend.[2]  The testimony defendant Armstrong's girlfriend provided at trial in the domestic violence case differed from previous statements she made to the Nampa Police Department, as well as from her testimony at defendant Armstrong's detention hearing.  Indeed, defendant Armstrong was later charged with witness intimidation and violation of a no-contact order based on his alleged attempts to influence her testimony.  At defendant

---

[2]    Defendant Armstrong was acquitted at trial, although he was later charged with witness intimidation and violation of a no-contact order based on his alleged attempts to influence his girlfriend's testimony with respect to the misdemeanor assault charge.  On April 1, 2009, defendant Armstrong pleaded guilty to violating a no-contact order and the remaining witness intimidation charges were dismissed pursuant to a plea agreement.

Armstrong's detention hearing, his girlfriend also admitted to staying in contact with defendant Armstrong despite a no-contact order issued in the domestic violence case.  Should it become necessary, the United States may request permission of the Court to treat defendant Armstrong's girlfriend as an adverse witness and examine her with leading questions during her direct examination.

The United States also anticipates that defendant Armstrong may call his girlfriend as a defense witness.  The United States would not object to defendant Armstrong calling his girlfriend out of order during the government's case-in-chief to facilitate the presentation of evidence and minimize any burden on the witness.  However, the United States would request that after the United States conducts its direct examination and the defendants cross-examine this witness, defendant Armstrong be required to conduct a direct examination his girlfriend in accordance with established evidentiary principles, followed by cross-examination by the United States and the other three defendants.

**IV.     CONCLUSION**

The United States respectfully submits this trial brief to assist the court at trial in this matter.  The United States will separately file proposed jury instructions, proposed <u>voir dire</u>, an exhibit list, and a witness list.

DATED this 2nd day of July, 2009.

<div style="margin-left: 45%;">

THOMAS E. MOSS
United States Attorney
District of Idaho
By:


_____
/s/ Wendy J. Olson
Assistant United States Attorney


LORETTA KING
Acting Assistant Attorney General
United States Department of Justice
Civil Rights Division
By:


_____
/s/ Erin Aslan
Trial Attorney
Criminal Section

</div>

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I am an employee of the United States Attorney's Office for the District of Idaho, and that a copy of the foregoing Trial Brief of the United States was served on all parties named below this 2nd day of July, 2009.

      ___ United States Mail, postage prepaid
      ___ Hand delivery
      ___ Facsimile Transmission (fax)
      ___ Federal Express
      _x_ ECF Filing

Ms. Elisa Massoth
Ketlinski, Massoth, Rebholtz & Soper, PLLC
Attorneys at Law
910 East Cleveland Boulevard
Caldwell, Idaho 83605
Attorney for Michael J. Bullard

Mr. John C. DeFranco
Ellsworth, Kallas, Talboy & DeFranco, PLLC
Attorneys at Law
1031 East Park Boulevard
Boise, Idaho 83712
Attorney for Jennifer J. Hartpence, a/k/a Jennifer Erickson

Mr. R. Wade Curtis
Belnap, Curtis & Williams, PLLC
Attorneys at Law
1401 North Shoreline Drive, Suite 2
Post Office Box 7685
Boise, Idaho 83707-1685
Attorney for Richard C. Armstrong

Mr. Gustav Rosenheim
Rosenheim Law Office
960 Broadway, Suite 210
Boise, Idaho 83706
Attorney for James D. Whitewater

_____
/s/ Wendy J. Olson